UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PHILIP JOHNSON, pro se,

                Plaintiff,

                -against-

STATE OF NEW YORK; CITY OF NEW YORK;
A.C.S., QUEENS ADMINISTRATION FOR
CHILDREN'S SERVICES; A.C.S. UNIT "68-4";
QUEENS A.C.S EMPLOYEES, JANE DOE a/k/a
KAGAN, JANE DOE a/k/a POLLAK,

                Defendants.
----------------------------------------------------------------x

**MEMORANDUM AND ORDER**

04-CV-1070 (DLI)(LB)

**DORA L. IRIZARRY, U.S. District Judge:**

      Pro se plaintiff Philip Johnson commenced this action on March 12, 2004 pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and "The Constitution of the United States and All of Its Amendments in Particular Amendment's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15" against the State of New York, the New York City Administration for Children's Services ("ACS") and the City of New York ("City"), as well as against Jane Does a/k/a Alexsandra Kagan and Robin Pollack (collectively "Defendants"), alleging the violation of his civil rights. This claim stems from a determination by the ACS that the removal of plaintiff's children would be appropriate on March 11, 2004.

      By Memorandum and Order dated August 6, 2004, U.S. District Judge Allyne R. Ross dismissed the claims against the State of New York and any claims seeking to challenge the temporary order of protection or for any other injunctive relief regarding the custody of plaintiff's children pursuant to 28 U.S.C. § 1915(e)(2)(B). In so doing, Judge Ross determined that the only issue remaining before the court is whether the emergency removal of plaintiff's children on March

11, 2004 violated plaintiff's procedural due process rights. Specifically, Judge Ross stated, "The record currently before the court is insufficient to determine whether 'a reasonably perceived emergency' justified the City Defendants' 'temporary assertion[] of custodial authority' over the plaintiff's children." (Defs.' Ex. E at 5.)

All defendants have now moved for summary judgment. The court is mindful that plaintiff is proceeding pro se in this case. As a result, the court is "obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (citing *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)). For the reasons set forth below, defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety.

**I.  Facts**

This is the second action plaintiff has filed based on the removal of his children by ACS. On August 12, 2002, plaintiff brought suit against ACS and the City of New York alleging violations of his civil rights stemming from the emergency removal of his children on June 3, 2002. *See Johnson v. Queens Administration for Children's Services,* No. 02-CV-4497, 2006 WL 229905 (E.D.N.Y. 2006). Specifically, plaintiff alleged that he was not given notice and a prompt hearing to contest the removal. In a Memorandum and Order dated January 31, 2006, this court granted defendants' motion for summary judgment finding that there had been no violation of plaintiff's constitutional right to due process.[1]

---

[1] A portion of plaintiff's "response" to defendants' motion for summary judgment rehashes the circumstances of his previous lawsuit. Plaintiff's legal contentions with respect to the June 2002 removal of his children have already been considered and dismissed by the court. As such, the court deems plaintiff's assertions based on the June 2002 removal of his children to be irrelevant.

Plaintiff is married to Marion Johnson, and prior to 2001, he had lived with her and their four children, Jazmon Shelborn, Ashley Johnson, Ethan Johnson and Zalika Johnson. (Defs.' Ex. A at 2; Defs.' Ex. F, Johnson Dep. at 25-26, June 15, 2005.) On June 4, 2002, the Family Court of the State of New York, Queens County ("Queens Family Court") entered a Temporary Order of Protection against plaintiff, excluding him from the family home at 130-26 226th Street in Queens, and prohibiting any unsupervised contact between plaintiff and their children. (Defs.' Ex. G.) The Family Court proceeding resulted in a finding of neglect against plaintiff on August 30, 2002 for: (1) impairing the physical, mental and emotional condition of the children; (2) failing to provide a minimum degree of care in providing the children with proper supervision; and (3) imprisoning the children and enforcing [plaintiff's] view of education with physical punishment. (Pierre-Louis Decl. ¶ 5.) On March 5, 2003, the Family Court issued a one-year Order of Protection for Marion Johnson and the four children that expired March 5, 2004. (*Id*. at ¶ 6.) As a part of the court-ordered supervision, the case was assigned to Family Services Worker Audrey Pierre-Louis ("FSW Pierre-Louis"). (*Id*. at ¶ 4.)

Plaintiff returned to the family home on Friday, March 5, 2004. (*Id*. at ¶ 6.) Over the weekend, plaintiff announced that he intended to remove the children from public school in order to "homeschool" them. (Defs.' Ex. F, Johnson Dep. at 42.) In proceedings before the Queens Family Court, Ashley testified that plaintiff's approach to homeschooling involved waking the children up "in the middle of the night" for lessons, but keeping them trapped on the second floor of the house during the day. (Defs.' Ex. I at 49-50.) Ashley further testified that plaintiff would hit the children with a belt if they answered incorrectly, and that the beatings would leave "welts" – where "the skin is coming up a little bit . . . and it's red." (*Id*. at 52-53.) Zalika testified that plaintiff would "teach

3

[the children] stuff they already [knew]" late at night around "11:00, 12:00" at night. (*Id*. at 32.) Plaintiff forced the children to stay in their bedrooms, not even allowing the children to "go downstairs" to eat or drink water. (*Id*. at 33.) If the children left their rooms, plaintiff would hit them "with a belt . . . anywhere on our bod[ies]." (*Id*. at 34.)

On the morning of Monday, March 8, 2004, the Johnson children got dressed and ready to leave for school, but found plaintiff standing at the front door of the family home blocking their way. (Defs.' Ex. F, Johnson Dep. at 128-29.) Ashley testified that plaintiff "was standing by the door with the belt," and that when she attempted to push past him in order to catch her school bus, plaintiff "grabbed [her] so that [she] couldn't get out of the house and ripped [her] shirt and he scratched [her]" on her "chest or by [her] shoulder." (Defs.' Ex. I. at 41-56.) Ashley indicated that the scratch was approximately one to two inches and left a "welt." (*Id*. at 45-46.) Ashley's testimony was corroborated both by her mother, Marion Johnson, and her sister, Zalika Johnson. (*Id*. at 28-30; Defs.' Ex. J. at 67.) Plaintiff admits to having pushed Ashley and blocking her way through the front door. (Defs.' Ex. F, Johnson Dep. at 130.) Following the altercation, the children summoned the police to the family home. (*Id*. at 63-64.) The police informed plaintiff that he had to allow his children to attend school, and they then escorted Ashley to her bus stop, and made sure that the other children were allowed to travel to their respective schools. (*Id*. at 65.)

Ashley did not return home from school on March 8, 2004. (*Id*. at 66.) The next day, plaintiff and his wife discovered that Ashley was staying at the home of a paternal aunt and uncle who lived in the neighborhood ("relatives' house"). (*Id*. at 67.) On March 10, 2004, plaintiff tried to file a missing person's report with police but was told that since he knew of Ashley's whereabouts, she was not a missing person. (Compl. at 7.) However, plaintiff's second attempt at

4

filing a missing person's report, on March 11, 2004, was successful. (*Id*.) Also on March 11, 2004, the Queens field office of ACS received three Oral Report Transmittals ("ORTs") from the New York State Central Registry (one from Ashley's school, one from the Police Department, and one from FSW Pierre-Louis), which contained allegations of educational neglect and abuse. (Defs.' Ex. K.) The case was assigned to ACS Caseworkers in the educational neglect unit of the Queens ACS field office ("CWs"), Kagan and Pollack. (Defs.' Ex. L at 29-30.)

On March 11, 2004, the CWs made a home visit to speak with plaintiff and Marion Johnson. (*Id*. at 30-31.) Plaintiff did not permit the CWs to enter the family home or to speak with the other children who were present, Ethan and Zalika Johnson. (*Id*. at 31.) Marion Johnson informed the CWs that the family was on its way to the relatives' house to retrieve Ashley, and that they could follow them there if they wanted to speak with their children. (*Id*. at 33; Defs.' Ex. F, Johnson Dep. at 73.)

Upon arrival at the relatives' home, the CWs found the police already on the scene because of the missing person's report that plaintiff had filed. (Defs.' Ex. F, Johnson Dep. 74-75.) The police allowed the CWs to speak with each child individually, away from plaintiff. (*Id*. at 77-78, 80-81, 84.) During the interviews, the children described several instances of physical abuse that had occurred since plaintiff returned to the family home on March 5, 2004. Ashley told the CWs about the March 8, 2004 altercation with plaintiff during which he scratched her and ripped her shirt, and stated to CW Kagan that she refused to go home after leaving school on March 8, 2004 because she was afraid of her father. (Defs.' Ex. L at 37-38.) Zalika informed the CWs that plaintiff had slapped her when she attempted to attend school on March 8, 2004. (*Id*. at 43.) During the proceedings before the Queens Family Court, Zalika testified that she had been waiting for Ashley to escort her

5

to their relatives' house. However, plaintiff caught her before Ashley arrived, slapped her, and took her home. (*Id*. at 30-31.) Ethan stated that plaintiff had hit him on his left hand with a belt on at least one occasion since returning to the family home. (*Id*. at 40.) The children all corroborated their respective accounts of the abuse plaintiff had inflicted upon them since returning to the family home on March 5, 2004. (*Id*. at 35-43.) The children also individually and collectively expressed their fear that plaintiff would hurt them for speaking to the CWs if they returned home with him. (*Id*.) The CW testified that, "all the children indicated that they were afraid to go home because the mother is supposed to go to work and they were afraid to be with the father on this night," March 11, 2004. (*Id*. at 42.)

While the CWs were interviewing the Johnson children, FSW Pierre-Louis called to check that Ashley had arrived at the relatives' house safely. (Pierre-Louis Decl. ¶ 30.) FSW Pierre-Louis gave the CWs a factual account of ACS' involvement with plaintiff and the Johnson family, including the fact that there had recently been a finding of neglect against plaintiff by Judge Heffernan of the Queens Family Court, after fact-finding, for excessive corporal punishment of his children. (*Id*. at ¶ 31.) FSW Pierre-Louis further informed the CWs that Ashley had just been to her office recounting the altercation that occurred with plaintiff on March 8, 2004. (*Id*. at ¶ 32.) Ashley had also expressed fear to FSW Pierre-Louis of being forced to return to the family home with plaintiff because she believed plaintiff would punish her for running away. (*Id.* at ¶ 22.) FSW Pierre-Louis recalls that the bruise on Ashley's shoulder region was still visible when she was in the office. (*Id*. at ¶ 21.)

After interviewing the Johnson children and speaking with FSW Pierre-Louis, the CWs determined that the Johnson children should be removed from plaintiff's custody. (*See* Defs.' Ex.

J at 14-15, 36.) However, the CWs allowed Marion Johnson to avoid removal if she consented to leaving the children at the relatives' house for the night of March 11, 2004. (Defs.' Ex. F, Johnson Dep. at 80, 85.) The CWs also informed plainitff and his wife that, should they try to take their children home, ACS would be forced to remove the children on an "emergency basis." (*Id.*) Marion Johnson then consented to leaving the children in the relatives' care and informed plaintiff of this decision. (*Id.* at 81-82, 85, 137.)

Later that evening, plaintiff drafted the complaint in the instant action. The next day, on March 12, 2004, FSW Pierre-Louis delivered a Notice of Temporary Removal of Children and Right to Hearing, (a "701(b) Notice") to plaintiff's home. (Defs.' Ex. N; Pierre-Louis Decl. ¶ 36.) Plaintiff testified that he was aware of FSW Pierre-Louis's visit on March 12, 2004, and knew that she had delivered paperwork of some kind to plaintiff's home. (Defs.' Ex. F. Johnson Dep. at 93-95, 98.) On March 17, 2004, ACS filed neglect petitions in Queens Family Court. (Defs.' Ex. M.) That same day, Family Court Judge Richroath ordered that the Johnson children be remanded to the custody of ACS, paroled the children to their mother's care, and entered an Order of Protection excluding plaintiff from the family home and prohibiting any unsupervised contact between plaintiff and the children. (Defs.' Ex. B; Defs.' Ex. O.) ACS served plaintiff with the Order of Protection on March 17, 2004. (Defs.' Ex. F, Johnson Dep. at 179.) On March 22, 2004, plaintiff made an application pursuant to New York Family Court Act § 1028 for the return of the children to his custody. (Defs.' Ex. L at 3.) On March 31, 2004, the Queens Family Court determined the children would be put at imminent risk if plaintiff were allowed back into the family home, and continued the Order of Protection against plaintiff. (Defs.' Ex. P at 21.) The fact-finding proceedings in the underlying Family Court case were still pending as of March 1, 2006. (Defs' Rule 56.1 Stmt ¶ 82.)

**II.     Discussion**

    **A.     Summary Judgment Standard**

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When ruling on a motion, the court must view any disputed information in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 457, 112 S. Ct. 2072, 2076–77, 119 L. Ed. 2d 265 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)). Summary judgment is inappropriate if any there is "any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party" regarding a genuine issue of material fact. *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (emphasis added). However, the nonmoving party cannot rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

    **B.     As an Agency of the City, ACS Cannot be Sued**

The claims against ACS must be dismissed for lack of jurisdiction. The capacity of ACS to be sued is governed by Rule 17(b) of the Federal Rules of Civil Procedure, which states that the issue

is a question of state law. *Baker v. CNY Agency for Children Servs.,* No. 98 CV 5970, 1999 WL 260948, at *2 (E.D.N.Y. Apr. 21, 1999). In New York, it is well-settled that "[g]overnmental agencies have only those powers which are conferred expressly or by necessary implication; power is not to be inferred, and the principle of strict construction should be applied in interpreting statutory grants of power." *Yonkers Comm'n on Human Rights v. City of Yonkers,* 654 F. Supp. 544, 551 (S.D.N.Y. 1987). Pursuant to Section 396 of the New York City Charter, "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." *Baker,* 1999 WL 260948, at *2. Hence, the action filed against ACS must be dismissed since the agency lacks the power to sue or be sued. *See Id.*

**C.    42 U.S.C. § 1983**[2]

It has long been settled in the Second Circuit that "a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection." *Cecere v. New York,* 967 F.2d 826, 829 (2d Cir. 1992) (citing *Stanley v. Illinois,* 405 U.S. 645, 649-58, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)); *Hurlman v. Rice,* 927 F.2d 74, 79 (2d Cir. 1991). As a general

---

[2]To the extent plaintiff may be asserting claims regarding the adequacy of the Family Court proceedings, the court lacks subject matter jurisdiction. Under the *Rooker-Feldman* doctrine, a district court is barred from reviewing issues that have already been adjudicated in the state court. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 283-84, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). Also barred are issues raised in federal court that are "inextricably intertwined" with state court decisions, for example, where an appeal from a state court decision is pending, and the federal court is asked to decide the validity of that same state court opinion. *See e.g., Exxon Mobil Corp,* 544 U.S. at 286 n. 1. As of March 1, 2006, the fact-finding proceedings in the underlying Family Court case were still pending. (Defs.' Rule 56.1 Stmt ¶ 82.) Whether ongoing or final, the court lacks subject matter jurisdiction to address issues dealing with child custody, neglect and visitation. *See Phifer v. City of New York,* 289 F.3d 49, 57 (2d Cir. 2002).

rule, due process, ordinarily in the form of a predeprivation hearing, must be accorded before parents can be deprived of the custody of their children without their consent. *See Stanley,* 405 U.S. at 649. At the same time, however, the "State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse." *Tenenbaum v. Williams,* 193 F.3d 581, 593-94 (2d Cir. 1999). If "emergency circumstances" exist, a child may be taken into custody by a responsible State official without court authorization or parental consent. *Hurlman,* 927 F.2d at 80 (citing *Robinson v. Via,* 821 F.2d 913, 921 (2d Cir. 1987). Such "temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process." *Cecere,* 967 F.2d at 829. A "reasonably perceived emergency" exists where (1) an "immediate threat to the safety of the child" exists, or (2) "the child is left bereft of care and supervision," or (3) there is "evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Hurlman*, 927 F.2d at 80 (internal citations omitted).

In order to establish the liability of a municipality under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must prove "that the violation of his constitutional rights resulted from a municipal custom or policy." *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996). This "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Board of the County Comm'rs v. Brown,* 520 U.S. 397, 403-04, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

In the instant action, plaintiff contends that the determination by ACS to remove the children from his custody on the evening of March 11, 2004 violated his civil rights. Plaintiff has failed to provide evidence in support of this allegation. Along with defendants' summary judgment motion,

plaintiff received defendants' Local Civil Rule 56.2 Notice to Pro Se Litigant Opposing Motion for Summary Judgment which explained the consequences of failing to controvert the facts contained in the defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts, and outlined plaintiff's responsibilities in opposing defendants' summary judgment motion. As defendants note, plaintiff failed to submit a statement of undisputed material facts, as is required by Local Rule 56.1. *See* E.D.N.Y. Local R. 56.1(c) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement" of the non-moving party). The court notes that plaintiff's pro se status does not exempt him from the usual requirements of summary judgment. *See Smith v. Planas,* 975 F. Supp. 303, 305 n. 2 (S.D.N.Y. 1997). While the court can construe plaintiff's "Response to Notice of Motion for Summary Judgment" as his statement of facts as required by Rule 56.1, plaintiff's response fails to controvert much of the factual assertions made by the City. Accordingly, the court considers any uncontroverted portions of the City's 56.1 Statement admitted.

Moreover, plaintiff's response consists largely of conclusory allegations and unsubstantiated speculation, even though plaintiff has sworn to the statements contained therein. It is insufficient for plaintiff to try to defeat a motion for summary judgment by merely relying upon "conclusory allegations or unsubstantiated speculation." *See Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Alemas,* 143 F.3d 105, 114 (2d Cir. 1998)). Therefore, to the extent that plaintiff relies upon conclusory allegations, the court must view the facts as those stated by the City's Rule 56.1 statement and documentary evidence.

1.  Plaintiff Has Not Demonstrated a Constitutional Violation

Defendants contend that the Johnson children were not "removed" from plaintiff's custody on March 11, 2004 because Marion Johnson consented to leaving the children at the relatives' home. (*See* Def.'s Local Rule 56.1 Stmt ¶¶ 67-70; Defs.' Ex. F, Johnson Dep. at 81-81, 85, 137.) The court agrees. After determining that the Johnson children should be removed from plaintiff's custody, the CWs gave Marion Johnson the opportunity to avoid removal of the children by consenting to leave the children at the relatives' house for the night of March 11, 2004. (*Id.* at 80, 85.) The CWs informed plaintiff and Marion Johnson that, should they try to take their children home, ACS would be forced to remove the children on an "emergency basis." (*Id.*) Marion Johnson then consented to leave the children in the relatives' care and informed plaintiff of this decision. (Defs.' Ex. F, Johnson Dep. at 81-81, 85, 137.) Thus, plaintiff was not deprived of the custody of his children because Marion Johnson's decision obviated the need for an emergency removal.

In any event, plaintiff's § 1983 claim fails because the record clearly demonstrates that a "reasonably perceived emergency" justified the City's "temporary assertion of custodial authority" over plaintiff's children. Before reaching the decision that removal was appropriate, the CWs conducted a thorough investigation that included separate interviews with each child, consultation with the family's previous caseworker, and a professional assessment of plaintiff's behavior and demeanor throughout the investigatory process. (*See* Defs.' Rule 56.1 Stmt. ¶¶ 31-71.) The investigation revealed evidence of serious ongoing abuse, as well as an immediate threat to the safety of the children should they be allowed to return home with their father. For instance, FSW Pierre-Louis gave the CWs a factual account of ACS' involvement with plaintiff and the Johnson family, including the fact that there had recently been a finding of neglect against plaintiff by Judge

Heffernan of the Queens Family Court, after fact-finding, for excessive corporal punishment of his children. (Pierre-Louis Decl. ¶ 5.) As a result, the Family Court had entered a permanent Order of Protection and ordered continued ACS supervision of the family. (*Id*. at ¶ 6.)

Moreover, during the interviews, the children described several instances of physical abuse that had occurred since plaintiff returned to the family home on March 5, 2004. Ashley informed the CWs about the March 8, 2004 altercation during which plaintiff scratched her and ripped her shirt when she attempted to catch the bus to school. (Defs.' Ex. L at 37-38.) Zalika told the CWs that plaintiff had slapped her for attempting to attend school that same day, and Ethan stated that plaintiff had hit him on his left hand with a belt on at least one occasion since returning to the family home. (*Id*. at 40, 43.) The children all corroborated their respective accounts of the abuse plaintiff had inflicted upon them since returning home. (*Id*. at 35-43.) Finally, reasonable time to obtain a judicial order consistent with the safety of the children did not exist here because, according to the CW, "all the children indicated that they were afraid to go home because the mother [was] supposed to go to work and they were afraid to be with the father on this night," March 11, 2004. (*Id*. at 42.) *See also Tenenbaum,* 193 F.3d at 596 ("we now hold that it is unconstitutional for state officials to effect a child's removal on an 'emergency' basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety . . . ."). FSW Pierre-Louis had also informed the CWs that Ashley was afraid to go home because she believed that plaintiff would punish her for running away. (Pierre-Louis Decl. ¶ 22.) Accordingly, plaintiff's constitutional right to the custody of his children was not violated because a "reasonably perceived emergency" situation existed.

## 2. Plaintiff Has Not Demonstrated a Municipal Policy or Custom

Plaintiff has introduced no evidence no show that the City has a policy, practice or custom of removing children from the custody of their parents on an emergency basis without prior justification. Plaintiff appears to argue that the fact ACS did not provide him with "paperwork" on the night of March 11, 2004 raises a genuine issue of material fact with respect to whether the City had a practice or policy of violating due process. Plaintiff's argument fails for two reasons. First, plaintiff admits that FSW Pierre-Louis delivered paperwork to plaintiff's home on March 12, 2006, after ACS had initiated proceedings to remove plaintiff's children. (Defs.' Ex. F, Johnson Dep. at 93-95, 98.) Second, the only issue before the court is whether a "reasonably perceived emergency" existed, not whether plaintiff was afforded due process by the ACS.

Accordingly, since plaintiff has failed to meet his burden of establishing that genuine issues of material fact exist as to whether plaintiff's constitutional rights were violated and that the City had a policy, plan, or custom of impeding due process, plaintiff's claim against the City of New York is dismissed.

## 3. Defendants Kagan and Pollak Are Entitled to Qualified Immunity

The doctrine of qualified immunity protects government officials from suits for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The doctrine "serves to protect governmental officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995). Defendants are entitled to qualified immunity if (1) their actions did not violate clearly

14

established law, or (2) it was objectively reasonable for them to believe that their actions did not violate such law. *See Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir. 1996). The objective reasonableness test is met if "officers of reasonable competence could disagree" on the legality of defendant's actions. *Lennon,* 66 F.3d at 420 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

Here, the individually named defendants, Child Protective Specialists Aleksandra Kagan and Robin Pollack, are entitled to qualified immunity because, as discussed above, their determination that an "emergency circumstance" existed did not violate clearly established law, and it was objectively reasonable for them to believe that the Johnson children had to be removed from plaintiff's custody. As the Second Circuit has stated:

> Protective services caseworkers [must] choose between difficult alternatives . . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for the decision, whichever way they make it.

*Tenenbaum,* 193 F.3d at 596 (quoting *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 866 (2d Cir. 1990)).

**VII. Conclusion**

For the reasons set forth above, defendants' motion for summary judgment is granted in its entirety. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED:     Brooklyn, New York
               March 9, 2007

                                           _____/s/_____
                                                   DORA L. IRIZARRY
                                             United States District Judge